# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS

Jeff Halliburton, # 714034 et al.[1]

          **Plaintiffs**

     **v.**

Rissi L. Owens, et al.
Jose Aliseda, Jr.,
Charles Aycock,
Conrith Davis,
Jackie DeNoyelles,
Linda Garcia,
Juanita M. Gonzalez,
In  official capacities as
Members of the Texas Board of
Pardons and Paroles
Texas Board of Pardons and Paroles
P.O. Box 13401, Capital Station
Austin, Texas  78711

     **- and -**

Elvis Hightower,
Thomas G. Fordyce,
Pamela D. Freeman,
James Paul Kiel, Jr.,
James C. Poland,
Lynn Ruzicka,
Tony Garcia,
Charles Shipman,

Case No. _____

Hon. Judge **A07CA 962SS**

**Complaint**

**With Jury Demand
Endorsed Hereon**

---

[1] There are 998 Plaintiffs are bringing this lawsuit and listed on the attached appendix. These Plaintiffs are part of a prior lawsuit against these same Defendants, Brasfield v. Owens, Case No. A 05-CV-1009, which is currently being appealed (Fifth Circuit Case No. 07-51148, titled Thunderhorse v. Owens.) This earlier case was dismissed without prejudice pursuant to Fed. R. Civ. P. 12(b)(6). Issues on appeal do not duplicate any of the issues set forth in this lawsuit.

1

Charles C. Speier,
Howard A. Thrasher, Sr.,
In their official capacities as
Parole Commissioners,
Texas Board of Pardons and Paroles
P.O. Box 13401, Capital Station
Austin, Texas 78711

- and –

Christina Melton Crain,
In her official capacity as
Chair of the Texas Board of
Criminal Justice,
209 West 14th Street – 5th Floor
Austin, Texas 78701

- and -

Brad Livingston,
In his official capacity as
Executive Director of the
Texas Department of Criminal Justice
209 West 14th Street – 5th Floor
Austin, Texas 78701

- and -

Nathaniel Quarterman,
In his official capacity as
Director of the Correctional
Institutions Division
Texas Department of Criminal Justice
209 West 14th Street – 5th Floor
Austin, Texas 78701

- and -

Pamela Williams,
In her official capacity as
Assistant Director for Classification and
Records, Support Services, for the
Correctional Institutions Division
Texas Department of Criminal Justice
209 West 14th Street – 5th Floor
Austin, Texas 78701

    - and -

Becky Price
In her official capacity as Assistant
Director for Classification and Records.
Texas Department of Criminal Justice
209 West 14th Street – 5th Floor
Austin, Texas 78701

    - and -

Stuart Jenkins
In his official capacity as
Director of the Parole Division
Texas Department of Criminal Justice
8610 Shoal Creek Blvd.
Austin, Texas 78757

Defendants

Class Action Complaint

(Fed. R. Civ. P. 23)

Pursuant to Rule 23 of the Federal Rules of Civil Procedure, and on behalf of themselves and classes alleged in this complaint, Plaintiffs state the following complaint against Defendants:

## Jurisdiction and Venue

1. Jurisdiction is conferred upon this court by 28 U.S.C. § 1331 which authorizes federal courts to decide cases concerning federal questions, and by 28 U.S.C. § 1343(a) which authorizes federal courts to hear actions brought under 42 U.S.C. § 1983 [hereafter *§ 1983*].

2. Venue is proper in this Court because these Defendants are Texas residents, as well as officers and employees of Texas, acting in their official capacities and under color of state authority. The business of these Defendants is conducted throughout the state of Texas, including the Western District. Furthermore, many proposed class members are held in custody in the Western District of Texas. Thus, their claims arise in the Western District. Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b) (1).

## Applicable Federal Statutes

3. The Prison Litigation Reform Act, 42 U.S.C. § 1997 (e)(a) stipulates that no action shall be brought with respect to prison conditions under § 1983 until available administrative remedies are exhausted. For a § 1983 civil rights grievance, inmates can file a grievance with the Grievance Commissioner in the Texas Department of Criminal Justice. A Step 1 Grievance is filed at the Unit or prison level. A Step 2 Grievance is filed with the Central Office. Exhaustion of administrative remedies involves the filing

of a Step 1 and Step 2 grievance. However, parole is not a grievable issue. Accordingly, the exhaustion requirement of the Prison Litigation Reform Act does not apply, as there are no administrative remedies to exhaust for parole or mandatory supervision issues.[2]

## Parties

4. Plaintiffs are offenders who have been convicted of felonies and incarcerated in Texas. The names, institution numbers and residences of our Named Plaintiffs as of November 20, 2007, are listed in Exhibit A and incorporated by reference as if each name, number and address is printed here. This is an inmate funded class action and Plaintiffs anticipate adding new class members until they number into the thousands.

5. Defendants Rissi L. Owens, Jose Aliseda, Jr., Charles Aycock, Jackie DeNoyelles, Linda Garcia, Juanita M. Gonzalez and Elvis Hightower are members of the Texas Board of Pardons and Paroles, hereafter the *Parole Board*. These parties are being sued solely in their official capacities. Under Texas law, the Parole Board has the status of an independent agency charged with the authority to make decisions regarding the granting and revoking of paroles and the terms and conditions for release from prison.

6. Defendants Gerald Garrett, Thomas G. Fordyce, Pamela D.

---

[2] *See* V.T.C.A., Government Code § 508.149 (d). [No administrative or judicial appeals for denial of Discretionary Mandatory Supervision].

Freeman, James Paul Kiel, Jr., James C. Poland, Lynn Ruzicka, Edgar Morales, Charles Shipman, Charles C. Speier and Howard A. Thrasher, Sr. are Parole Commissioners. These parties are being sued only in their official capacities. The official duties of Parole Commissioners also involve interviewing inmates and issuing subpoenas.

7. Defendant Christina Melton Crain is Chairman of the Texas Board of Criminal Justice. Ms. Crain is being sued only in her official capacity. Through her duties, Ms. Crain is conducting business throughout the state, including the Western District. Through her position as Chair, we are further joining the Texas Board of Criminal Justice in its entirety and specifically all executives, agents and administrators, as well as any consultants if through their duties, they have any role in the matters set forth in this complaint.

8. Defendant Brad Livingston is Executive Director of the Texas Department of Criminal Justice, a/k/a *T.D.C.J.*. Defendant Livingston is being sued only in his official capacity. Acting in his official capacity, Mr. Livingston has authority to promulgate policies, rules and regulations governing the Texas Department of Criminal Justice. Through his duties, Mr. Livingston is conducting business throughout the state, including the Western District. Through Mr. Livingston's position as Executive Director, we are further joining all executives, agents and administrators, as well as any

consultants, if through their duties with the Texas Department of Criminal Justice, they have any role in the matters set forth in this complaint.

9. Defendant Nathaniel Quarterman is sued only in his official capacity as Director of the Correctional Institutions Division. This department was created in 2003, and represents a merger of the Institutional Division, Operations Division, Private Facilities Division and the State Jail Division. Mr. Quarterman is responsible for the operation of Support Services, headed by Defendant Williams, which includes Classification and Records. Through Mr. Quarterman and his position as Director of the Correctional Institutions Division, we are further joining all executives, agents and administrators, as well as any consultants, if through their duties, they may have any role whatsoever in any of the matters set forth in this complaint.

10. Defendant Pamela Williams is being sued only in her official capacity as Deputy Director for Support Services for the Correctional Institutions Division. Ms. Williams is responsible for supervising the operation of Classification and Records. Through Ms. Williams, we are further joining any agents, administrators as well as consultants, if through their duties, they may have any role whatsoever in any of the matters set forth in this complaint.

11. Defendant Becky Price is being sued only in her official capacity

as Assistant Director for Classification and Records. Ms. Price reports directly to Defendant Williams, Deputy Director for Support Services in the Correctional Institutions Division. Classification and Records schedules, receives, and processes offenders for intake, release, and transfers from the various units (i.e. prisons) operated by the Correctional Institutions Division. Classification and Records creates and maintains records on these offenders and serves as the principal repository for offender records for T.D.C.J. The Classification and Records Department uses a centralized offender record system to systematically group offenders. Classification and records provides technical support for all unit-based classification personnel.

12. Defendant Stuart Jenkins is being sued only in his official capacity as Director for the Parole Division. Mr. Jenkins supervises regional parole offices throughout the State of Texas. Through Mr. Jenkins, we are joining all agents, administrators as well as consultants if through their duties they may have any role whatsoever in the any of the matters in this complaint.

### Class Action Allegations

13. One class is proposed. The definition of this class includes:

   All Texas inmates presently incarcerated and eligible for parole.

14. Under this broad class, we request the creation of two subclasses.

(1) The first subclass, termed the *active class*, shall consist

of all Texas inmates that have financially supported the maintenance of this litigation through payment of a moderate legal fee (i.e. $400). Counsel for the class will maintain this list of active class members and keep opposing counsel abreast of new additions periodically or as requested.

(2) The second subclass, termed the *dormant class*, shall consist of all incarcerated Texas inmates that cannot financially support the maintenance of this litigation. All remaining Texas inmates shall fall in this class by default.

### Rule 23 Allegations

15. The above named Plaintiffs bring this action in their own behalf and for the class defined herein pursuant to Rule 23 of the Federal Rules of Civil Procedure. New Named Plaintiffs will be continually added to these existing Named Plaintiffs. This Complaint will not be amended solely for the purpose of adding new class members. Instead, all such future additions of Named Plaintiffs are hereby incorporated by reference as if fully printed here.

16. The class is so numerous, estimated at 168,000, that joinder of all members is impracticable.

17. Plaintiffs allege a common course of conduct maintained by these Defendants which is subject to common proof. As a result, there are questions of law and fact common to both classes.

18. The Named Plaintiffs will fairly and adequately protect the interests of both classes. The interests of the class of Named Plaintiffs are consistent with those of the class members. Plaintiffs' counsel knows of no

conflicts of interest among class members that would affect litigation between the attorney and class members.

19. The claims of Named Plaintiffs are typical of claims for class members. Named Plaintiffs seek the same remedies as class members; (1) injunctive relief and declaratory judgment relief pursuant to §1983.

20. Use of the class action mechanism is superior to other available methods for the fair and efficient adjudication of claims and will prevent the imposition of undue financial, administrative and procedural burdens on the parties and the Court that individual litigation of these claims would impose.

### Allegations Common to all Claims

21. Eligibility for parole is part of the criminal sentence. When every trial court judge sets a maximum sentence, they are equally mindful of the minimum sentence. In every case, a trial court judge has implicitly found, and the Court's sentencing order fully contemplates, that the penological interests of the State will be served if the criminal defendant is released at their first parole review. Further, orders of a trial court do not contemplate vain acts or empty formalities. At time of sentencing, the trial court sentence for all of these Plaintiffs took for granted the fact that they would receive serious release consideration at their first parole review, and for every succeeding review.

22. Defendants memorialize a parole decision by issuing a computer generated form consisting of codes, followed by conjunctive sentences listing eight or more independent reasons for engaging this code, without specifying which of these conjunctive sentences apply. The computer generated form does not even specify which part of the conjunctive sentence applies to their case.

23. Each code on this decision stands for a given reason for denying parole. The definition of this code constitutes the full explanation for the denial of parole. There are no other comments and no other reasons given.

24. Parole candidates do not receive any paper demonstrating how parole guidelines have been applied to their crime and their recidivism score.

25. In Texas, inmates have no right to appeal or challenge the denial of a parole in a Texas court. Texas courts have no authority to reverse a parole decision or to order the granting of a parole over the Parole Board's objection.

### Claim 1 – Violation of Due Process

26. The Due Process Clause of the U.S. Constitution has been applied to the States via the 14th Amendment [U.S. Const., Article XIV, § 1], which states: "... No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State

deprive any person of life, liberty or property without due process of law ...".

27. Violating the Due Process clause qualifies as a constitutional violation in satisfaction of the Prison Litigation Reform Act of 1996. [3] When evidence indicates the Parole Board has violated the U.S. Constitution, the matter may be reviewed by a Federal court pursuant to §1983.

28. The State, acting through its Parole Board, has a practice and an established state procedure of subjecting a person convicted of a crime pursuant to the Texas penal code to an arbitrary change in their punishment. This is accomplished by corrupting the mandatory imposition of Parole Guidelines in such a way, so as to preserve the Parole Board's exercise of unbridled discretion contrary to a determinative system of constrained discretion characterizing parole guidelines generally and the Texas guidelines specifically, thereby rendering regular parole, a part of the sentence, illusory.

**Purpose Served by Parole Guidelines in General**

29. Parole guidelines constitute "a determinative system of constrained discretion."[4] It is well accepted "that any system such as the [Federal] sentencing guidelines requires line-drawing and that the system will fail if those lines are not observed."[5] Within these drawn lines, a firm consequence

---

[3] Pub. L. No. 104-134, 110 Stat. 1321 *codified* 42 U.S.C. § 1997 (e).
[4] *See* Glover v. U.S., 531 U.S. 198, 204 (2001) as applied to Federal Parole Guidelines.
[5] U.S. v. Guajardo, 950 F.2d 203, 207 (5th Cir. 1991).

should flow from the intersection of two coordinates, culminating in a parole guideline range and, from this guideline range, a firm parole date to follow.

30. The public purpose served by sentencing and parole guidelines is to further the goals of honesty, uniformity and proportionality.[6] Without firm guidelines constraining the exercise of discretion, the length of a prison term can be dependent upon such subliminal factors as the color of one's skin, the natural inclination of the judge to be punitive or merciful, and by overt pressure applied to judges holding elective offices by groups such as Mothers Against Drunk Drivers with agendas devoted to the increase of prison time.

31. In a parole context, where parole guidelines must be applied by hardened correctional staff functioning in a hierarchal environment where punishment is exalted and understanding is repressed, decision-makers clearly lack the structural insulation from prosecutorial influence to insure the indispensable elements of neutrality *coupled with* detached objectivity, which must necessarily accompany unbridled discretion.

32. A determinate system of constrained discretion sanitizes decision-making by introducing structure and transparency. This is achieved through adoption of a decision-making model which serves as a framework. Within this framework, any set of conceivable facts can be diagrammed. After

---

[6] *See* U.S.S.G.§ 1A1.1 [Application note, explaining how Congress sought to achieve honesty, uniformity and proportionality through guidelines.] 18 U.S.C. A. App.

consulting guidelines, any parole candidate should be able to determine the

time expected of them, given their crime and their past criminal history.

**Promulgation of Parole Guidelines by Texas Legislature**

33. Government Code § 508.144 [hereafter § 508.144] previously

stated, in pertinent part:

> (a) The Board *shall*: (1) develop according to an acceptable research the parole guidelines *that are the basic criteria upon which a parole decision is made*; (2) base the guidelines on the seriousness of the offense and the likelihood of a favorable parole outcome; (3) implement the guidelines; and (4) review the guidelines periodically; [Emphasis added.]

> (b) If a board member or parole commissioner deviates from the parole guidelines in voting on a parole decision, the member or parole commissioner *shall*: (1) produce a brief written statement describing the circumstances *regarding the departure from the guidelines*; and (2) place a copy of the statement in the file of the inmate for whom the parole decision was made. [Emphasis added.]

34. Given this text, it is undeniable that the Legislature has imposed a

determinate system (i.e. a system with defined limits) of constrained

discretion upon the Parole Board. This text requires the Parole Board to make

a parole decision within the guideline range and, if a deviation is made

outside of the guidelines without adequate explanation, this statute implies

that it can be overturned as a violation of Due Process.

35. The Texas Legislature recently reaffirmed its policy that parole

guidelines are *the basic criteria for making parole decisions*.[7] Stating this just once is enough. Stating it twice makes it imperative that every incarcerated class member is entitled to an evaluation for parole pursuant to properly drafted guidelines contemplated by Government Code § 508.144.

36. At the most recent session of the Texas legislature, Government Code § 508.144 was amended. Previously, if a board member or parole commissioner deviated from parole guidelines on a parole decision, the member or commissioner was required to produce *a brief written statement* describing the circumstances regarding the departure from the guidelines and to place a copy of the statement *in the file of the inmate* for whom the parole decision was made. As recently amended, Government Code § 508.144 now requires:

> "(b) If a board member or parole commissioner deviates from the parole guidelines in voting on a parole decision, the member or parole commissioner shall:
>
> (1) produce a *written statement* describing *in detail* the specific circumstances regarding the departure from the guidelines, and (2) place a copy of the statement in the file of the inmate for whom the parole decision was made; and (3) provide a copy of the statement *to the inmate* [8][Emphasis added to highlight changes.]

37. As amended, there are three significant changes. (1) Instead of a brief written statement, the Parole Board is required to provide a *written*

---

[7] *See* Texas House Research Organization Bill Analysis of SB 909 [later adopted as C.S.S.B. 909], dated May 18, 2007, at unnumbered page 2, last paragraph. This report is also available online at: www.criminaljusticecoalition.org/files/userfiles/909_HRO.pdf.

[8] Government Code § 508.144 (b) as amended.

*statement.* (2) Instead of a general description, they are now required to state *in detail* the specific circumstances necessitating a departure from the guidelines. (3) Instead of placing a copy of this departure in the inmate's parole file – which a Texas inmate has no right to see – they are now required to provide a copy *to the inmate*. These changes reinforce the concept of a determinate system of constrained discretion.

38. In its latest legislative enactments, the Legislature has also reaffirmed the basic principles of transparency, uniformity and honesty. Forcing the Board to give a copy of guideline departures to a parole candidate instead of just placing it in their file furthers *transparency*. Requiring a written report instead of a brief written report and mandating *details* for supporting an upward departure promotes *uniformity* and *honesty*. Through these amendments, the Texas Legislature has made it abundantly clear that the Parole Board is not entitled to exercise unbridled, free ranging discretion.

**Implementation and Description of Parole Guidelines**

39. At a meeting of the Texas Parole Board on January 18, 2001, the guidelines promulgated by Security Response Technology [hereafter *current Parole Guidelines*] were adopted and remain the parole guidelines up to the present time. These guidelines have been represented to the Legislature as a full faith, sincere response for complying with § 508.144 (a) and (b).

40. The current Parole Guidelines adopt a matrix sentencing approach. In an acceptable and commonly employed model for promulgating parole guidelines, the horizontal axis measures past criminal history, typically called risk factors, and the vertical axis measures the severity of the current crime.

41. The current Parole Guidelines have a horizontal axis measuring risk factors to determine a recidivism score. There are four risk categories, Low Risk (identified by the letter *L*), Moderate Risk (identified by the letter *M*), High Risk (identified by the letter *H*) and Highest Risk (identified by *H+*).[9] There are no time frames affixed to any of these categories.

42. The current Parole Guidelines have a vertical axis to measure the severity of the crime. Like the horizontal axis, the vertical axis bases the severity of the crime upon four risk categories, Low (identified by the letter *L*), Moderate Risk (identified by the letter *M*), High Risk (identified by the letter *H*) and Highest Risk (identified by *H+*). Once again, there are no time frames affixed to these categories.

43. Typically, boxes inside a matrix grid contain numbers defining a guideline range. For example, a risk score and a score for the severity of the crime might intersect at a box with numbers 48 to 60, standing for 48 to 60

---

[9] Contrary to the previous parole instrument, called a Pablo Score, where a high number was beneficial, under the current scoring instrument the objective is to achieve a low score. The range for Low Risk is 0 to 5, for Medium Risk it is 6 to 8, for High Risk it is 9 to 11 and for Highest Risk, it is 12 +.

months, reflecting both the crime and the inmate's criminal history. These timelines serve as benchmarks delineating the lower and upper boundaries of a guideline range. This time frame constitutes a determinative system of constrained discretion. Discretion is constrained by the boundaries defining this guideline range (i.e. no less than 48 and no more than 60 months). If a parole candidate engages these coordinates, they should anticipate a parole date within this time frame.

44. The current Parole Guidelines contain no such determinative system of constrained discretion. Instead of a range of months, there is simply a number. For example, taking a fictional offender with a low risk score but a high offense severity rating, the intersection of these two scores contains the number *4*. Under the number *4*, there is a probability range, specifically 21% to 35%. This number *4* appears in four squares. Each square contains this same percentage. If you fall into a square with *4* in it, you have a 21% to 35% chance of gaining parole.

**Assignment of the Offense Severity Rating**

45. There are safeguards embedded in the Code of Criminal Procedure and Penal Code to protect convicted Texas offenders from arbitrary changes in their punishments. Art. 42.01 § 1 of the Code of Criminal Procedure reads in pertinent part as follows:

"... The sentence served shall be based on the information contained in the judgment. The judgment shall reflect:...(13) *The offense or offenses for which the defendant was convicted;*"

Penal Code § 12.01 states:

(a) A person adjudged guilty of an offense under this code shall be punished in accordance with this chapter and the Code of Criminal Procedure.

(b) Penal laws enacted after the effective date of this code shall be classified for punishment purposes in accordance with this chapter. [10]

46. Consistent with Art. 42.01 § 1 of the Code of Criminal Procedure and Penal Code § 12.01 (a) and (b), the severity rating for the current offense must reference the offense of conviction set forth in the judgment.

47. The current Parole Guidelines specify the crime's severity rating as; "An offender's most serious active offense is assigned an Offense Severity Class according to the established list." The term *established list* refers to N.C.I.C. Codes and Offense Descriptions [hereafter N.C.I.C. Codes]. N.C.I.C. Codes are general offense categories used for enforcing warrants. [11] These are not mirror images of Texas Penal Code offenses.

48. Police officers retrieve N.C.I.C. Codes through in-car computers. After stopping a person on the highway, this on board computer enables them

---

[10] The Penal Code was first enacted in 1973 and last amended in 1993, effective September 1, 1994. Both dates preceded the adoption of these parole guidelines.

[11] N.C.I.C. stands for National Crime Information Center, an agency of the F.B.I. This agency also compiles a list of individuals previously convicted of felonies. This is not the list utilized by the Texas Parole Board.

to link the driver of the vehicle to any outstanding warrants. Since this is an arrest and not a conviction, N.C.I.C. Codes are deliberately broad. They are designed to cover any underlying offense for which a warrant may be issued.

49. As published by N.C.I.C., there are no values or weights, such as Low, Medium, High or Highest, attached to any of these offense descriptions. A police officer simply learns that the driver of a vehicle has an outstanding warrant and the underlying behavior generally corresponds to a particular code and offense description.[12]

50. To enter a value such as Low, Medium or High next to each N.C.I.C. Code, the Parole Board has appointed a Guideline Committee made up of Board Members and Parole Commissioners. This committee fills in the severity rating for each N.C.I.C. Code, knowing that this exercise of discretion erases the offense of conviction issued by a judge and substitutes in its place, a value attached to the crime determined by the Parole Board.

51. Government Code § 508.144 (a) and (b) does not confer any authority upon the Parole Board to set aside the judgment of a trial court and substitute in its place a severity rating of its own making for each offense of conviction. Code of Criminal Procedure Art. 42.01 § 1 (13) and Penal Code § 12.01 (a) and (b) expressly forbid such a procedure. The assignment of

---

[12] Several people working for the National Crime Information Center told us that these values could only be supplied by the judicial officer issuing the warrant.

severity rating scores by the Parole Board's Guideline Committee is *ultra vires*, meaning that there is no legal or constitutional basis for exercising this authority and, for this reason, these acts are beyond their power to perform.

52. A legal corollary (i.e. an inference naturally flowing from a matter already proven) can be drawn from the overt act of affixing values to N.C.I.C. Codes. The only place reserved for the current crime in these guidelines is the vertical axis. By purging the offense of conviction from the vertical axis, the Parole Board has assumed the authority of rating the crime's severity and they are dictating 50% of a parole candidate's guideline score.

53. Eliminating any trace of the offense of conviction is not the only flaw in the vertical axis formula. N.C.I.C. Codes track warrants for crimes. There is no component for a technical parole violator. By default, technical parole violators receive a prosecutorial coordinate instead of a remedial severity rating and they are incarcerated for their original crime *again*.[13]

54. Parole practices become arbitrary and irrational when, *as applied*, they mean that the offender's current offense is something other than the crime of conviction. Under the formula utilized by the current Parole Guidelines, there is not one case where the severity rating of the crime will reflect the offense of conviction. This indispensable factor is totally absent.

---

[13] This critical omission was pointed out by the Criminal Justice Policy Counsel, before it was abolished, in its January, 2003 biennial report on page 18.

**Absence of a Guideline Range**

55. Unlike the typical matrix sentencing grid, instead of guideline ranges, probability scores are assigned. The term *probability* contemplates the likelihood that something will happen, and it is typically applied to concepts that cannot be precisely quantified. Because it applies to matters that defy quantifying, *probability* measures *uncertainty*. This is the antithesis (i.e. the very opposite) purpose that parole guidelines are supposed to serve.

56. Every square in the current Parole Guideline grid affords some possibility for parole. For the square reserved for the highest criminal history and the most horrific crime, the probability for parole is 0 to 5%. Conversely, every square also allows for denial of parole. The lowest risk score and the lowest level crime converge on a square with a 76% probability for achieving parole, meaning that one out of four otherwise eligible parole candidates will be denied.

57. Indicative of the surreal (i.e. irrational reality) of the Parole Guidelines, parole candidates posing the lowest risk score and lowest level of crime still have no better than a three out of four chance of being paroled.

58. Probability scores *do not* impose limits upon the exercise of discretion. There is no firm consequence flowing from the intersection of two coordinates. Without a firm consequence attached to an intersection of two

22

coordinates, there is no determinative system of constrained discretion. Absence of a determinative system of constrained discretion means there are no guideline ranges. If there are no guideline ranges, there is no such thing as an upward departure. Upward movement requires a fixed reference point. Without an established guideline, there cannot be an elevated guideline.

59. As devised, the current Parole Guidelines impart the outward appearance of serious parole guidelines, while simultaneously nurturing and camouflaging the exercise of unbridled and unstructured discretion, which is the very decision-making mechanism they are supposed to render impossible.

60. Contrary to the federal matrix grid and the grid used by other states for parole, the current Parole Guidelines do not constitute a determinative system of constrained discretion. There are no benchmarks constraining the exercise of discretion. No firm consequence flows from the intersection of two coordinates, producing a parole release equation. Indeed, probability measures uncertainty, which renders it unsuitable for providing any guidance.

**Sources for Arbitrary and Capricious Decision-Making**

61. Each individual eligible for a parole determination has a right to actual consideration by proper procedure, rather than to a predetermined outcome imposed by an unpublished policy not adopted by the legislature.

62. The absence of firm guideline ranges constitutes the first source of

arbitrary decision-making. There is no constraint upon discretion, contrary to the Texas Legislature's clear mandate to impose such constraints, violating Government Code § 508.144. This factor affects everyone's placement.

63. The factor for rating the severity of the current crime must be based upon the offense of conviction. Current Parole Guidelines base the severity rating of the crime upon broadly drafted N.C.I.C. Codes used for enforcing warrants. Absence of the offense of conviction as the basis for the severity rating of the current crime violates Art. 42.01 § 1 of the Code of Criminal Procedure and Penal Code § 12.01 (a) and (b) and the Due Process Clause of the Fifth and 14th Amendments to the U.S. Constitution.

64. Just the act of erasing the actual offense of conviction dictated by a judge and substituting in its place a new code of offenses, namely N.C.I.C. Codes for issued warrants, further subjects every Texas offender to an arbitrary change in their punishment. Convicted persons are to be punished in accord with the Texas Penal Code exclusively.

65. Parole Board Members and Parole Commissioners have no legal or constitutional authority to affix a weight or a value to an N.I.C.I. Code, with full knowledge that this value will replace the offense of conviction. These overt acts effectively substitute their judgment of the crime's severity for a trial court's judgment. This arbitrary change to an offender's punishment

affects all inmates eligible for parole.

66. The absence of an N.C.I.C. Code for a technical parole violator is a sixth source of arbitrary decision-making. Due to this omission, the severity of the crime is arbitrarily and capriciously rendered punitive instead of remedial, requiring technical violators to serve the time for their crime *again* before becoming eligible for parole. Technical parole violators are at least one out of five and may be as much as three out of ten parole candidates.

67. Texas offenders have no means for challenging any of the components chosen for determining their guideline score, and they have no avenues for challenging the result where these components intersect. There are no checks of any kind upon these Parole Board practices and procedures.

## Claim 2 – Violation of Due Process

68 Government Code § 508.147 states that a parole panel *shall order* an inmate's release when: (1) the actual calendar time served, plus; (2) any accrued good conduct time equals the sentence to be served. Government Code §508.149 (b) states that an inmate may not be released to mandatory supervision if their accrued good conduct time is not an accurate reflection of their potential for rehabilitation and their release would endanger the public.

69.The Supreme Court has held that any state statute which mandates release *unless* certain findings are made creates a presumption that parole will

be granted.[14] The mandatory language in Government Code § 508.147 creates a liberty interest for all offenders eligible for mandatory supervision, and the Due Process Clause of the U.S. Constitution protects this liberty interest.

70. Once a liberty interest is established, the Due Process Clause may be invoked to challenge arbitrary state action. Texas inmates eligible for mandatory supervision have a right to be free of arbitrary state action. [15]

71. To overcome a presumption in favor of candidates for mandatory supervision release, the Parole Board has to justify continuing incarceration by: (1) finding that the inmate's accrued good conduct time *is not* an accurate reflection of their potential for rehabilitation; and (2) finding the offender's release would endanger the public.[16] These findings are predictive judgments. The most reliable source of information for predicting future behavior is the most current information regarding their present behavior. Defendants have ready access to all institution files where this information can be found.

72. Defendants have a practice and an established state procedure of denying mandatory supervision by parroting the obligatory findings in Government Code § 508.149(b), paying only cursory, insincere attention to the legal burden assigned and invoking for good cause a reference to the

---

[14] Board of Pardons v. Allen, 482 U.S. 369, 378 (1987) [hereafter *Allen*].
[15] Daniels v. Williams, 474 U.S. 327, 331 (1986)
[16] 74th Legislature, H.B. 1433 Comm. Report (Amended). *See also* V.T.C.A. Government Code § 508.149(b)

nature of the offense. The nature of the offense is the poorest and least reliable indicator of future predictive behavior. This information is old; it is obsolete because it has been superceded by more current information; and it is suspect because it has been selectively molded to support a felony conviction. The nature of the offense is also an inflexible, unchanging factor, providing no assistance in predicting the future conduct required for denying mandatory supervision.

73. Defendants have a practice and an established state procedure of arbitrarily and perfunctorily denying mandatory supervision. Proof of arbitrary treatment consists of; (1) no evidence or reasoned argument to support either factual finding required for denial; (2) no signature at the end of the letter; (3) use of boilerplate, standard language identical in content and form with all other mandatory supervision denial letters; (4) no dignified letterhead, State seal or any other mark typically affixed to correspondence certifying its source as a genuine instrumentality of Texas; and.(5) the letter is generated by a dot matrix printer on light grade paper inferior to business stationary.

74. Defendants have a practice and an established state procedure of denying mandatory supervision, despite a plethora of evidence attesting to the fact that the mandatory supervision candidate is conspicuously eligible.

75. Plaintiffs have no administrative or judicial remedies to pursue if their mandatory supervision release is denied.[17]

76. For reasons enumerated herein, Plaintiffs are subjected to arbitrary state action and their rights under the Due Process Clause are being violated.

### Claim 3 – Violation of Due Process

77. Through T.D.C.J. Administrative Directives adopted to enforce Government Code § 498.003 (c) and (d), Plaintiffs receive one day of good time and a half day of work credit for every calendar day served. *Good conduct time r*efers to these earned credits. If granted, these credits can accelerate the date for completing a prison sentence. For example, aided by these credits, a 10 year sentence can be served in 4 years.

78. Pursuant to Government Code § 508.147 (i.e. the statute granting mandatory and discretionary mandatory supervision), when earned good time credits, work credits and calendar time equals the maximum sentence issued by a judge, the parole candidate is eligible for release. Upon granting the parole candidate mandatory supervision, the following protocol is followed.

> (a) If the mandatory discretionary statute applies, the Parole Board first must find that the parole candidate's good conduct time is a faithful reflection of their rehabilitation and they no longer present any danger to society. These are required conditions for the mandatory discretionary statute.

---

[17] V.T.C.A., Government Code § 508.149 (d).

(b) Accrued good time and work credits are credited toward the sentence and carry the same weight as calendar time served.[18] This has the effect of shortening the custody portion of the sentence.

(c) Once credited, the accumulated time equals the *maximum* sentence issued by the judge and release to mandatory supervision is ordered.

(d) The mandatory supervision certificate is silent on good conduct credits and work credits. This certificate simply states; "The period of Mandatory Supervision shall be for a period equivalent to the maximum term for which the offender was sentenced less calendar time actually served on the sentence." For a fictional offender with a ten year sentence, they would be released after 4 years and would begin six years of supervision.

(e) Just before being released, the parolee is asked to sign a contract setting forth the conditions for release on parole. Pursuant to Gov. Code § 508.154, the acceptance and execution of this contract is a precondition to parole or release under mandatory supervision. By signing this contract, good conduct time and work credits are not forfeit. By operation of law, these credits are declared unsuitable for time served while on parole.[19]

(f) Upon release from custody, there is no discharge granted from their crime. Instead, the releasee is still serving time for their crime, and they still hold their accrued good conduct and work credits earned while incarcerated.

(g) While maintaining good standing on parole, only calendar time applies while under supervision.

(h) If a supervision term is violated, Government Code §

---

[18] To illustrate, a 10 year sentence would have 4 years of calendar time, 4 years of good time and 2 years of work credits. In the final tabulation, each part is added to equal 10.
[19] *See* V.T.C.A. Government Code § 508.142 (c) and Gov. Code § 508.155(b)[Defining period of parole as consisting of only calendar time].

498.004 (b) states that all accrued good time and work credits are forfeit. At this time, accrued good conduct credits are lost. In addition, if less than half of the time still owed since time of release has not been served, street time is also lost.

(i) Because there are no provisions for a technical parole violator in the parole guidelines, prison time assigned to every technical parole violator is based upon their original crime. While the rule infraction may warrant only a remedial penalty, the system is prompted *by default* to impose a punitive sentence. This default response is triggered because the parole guidelines do not contemplate and make no allowance for a technical parole violator.

(j) This entire process is administratively operated by Defendants without any judicial supervision. Within this sphere of authority, the discretion exercised by these Defendants is unchecked and unbridled. Plaintiffs have no avenues for challenging the exercise of this authority.

79. Texas prison terms are extraordinary long and the terms for serving these sentences are especially harsh, even if executed benevolently. A 99 year maximum sentence for a first degree felony places enormous leverage in the hands of prosecutors, and causes thousands of plaintiffs to beg for sentences of 20 or 30 years when normally such sentences would only be issued to the most incorrigible offender. Making an offender serve every day of this sentence either in prison or on supervision is also especially harsh.

80. With every technical violation, an inmate can be ordered back to prison, often their time in good standing on parole is lost, their previous accrued good time and work credits are now worthless and the clock ticking

off time served begins anew. This administrative process causes Plaintiffs to serve sentences in increments, and these increments often exceed the calendar sentence ordered by the judge. Many technical violations spring from fear of this process. For example, getting stopped by a policeman for a speeding ticket and failing to tell the parole officer due to the draconian consequences can cause a person to be returned to prison just for not reporting this stop.

81. When a Plaintiff is granted mandatory supervision, they have served every day ordered by a judge. If they are under the mandatory discretionary statute, they have also been declared rehabilitated and no longer a danger to society. These facts are undeniable. From these facts, the following conclusion follows. Every inmate granted mandatory supervision has been given a constructive discharge (i.e. fulfilled but not acknowledged) from their crime of conviction.[20]

82. Declaring good time and work credits unsuitable for credit on parole but still existing is a logical fallacy [21] and a fiction. The premise for

---

[20] *Ex parte Anderson*, 192 S.W. 2nd 280 (Tex. Crim App. 1946) stands for the proposition that good time earned is necessarily time that has been served. Later caselaw has carried forth a reasonable inference drawn from In Re Anderson, namely that time which has been served should not be served again. *See* Pruett v. State of Texas, 468 F. 2nd 51, 57 (5th Cir. 1972). These authorities, coupled with the fact that an inmate must serve *the term* set by the court to qualify for mandatory supervision, support the premise that the prison sentence *for the crime* has been served.

[21] A *fallacy* in an argument is a component (i.e. one part of a whole) that is demonstrably flawed, rendering the entire argument invalid in whole. In a *logical fallacy*, the conclusion does not follow from the factual premise.

good time is to shorten a sentence. It is a reward for inmates that have demonstrated that they are rehabilitated and no longer a threat to society.

83. Once these credits are applied, their sole purpose has been served and there is no further utility left. The idea that these good time and work credits can be converted into a fiction, and thereafter destined to be forfeit if parole is revoked is a conclusion which does not follow its factual premise.

84. Once good time and work credits are applied, and the custody portion of the sentence has been fully served, administrators have no authority to order additional prison time *relating to the crime.*

85. Penalties such as loss of street time relate back to the original crime. Given the constructive discharge from the original crime, evidenced by the Certificate of Mandatory Supervision, there is no judgment to act against, because the judgment of conviction has been fulfilled.

86. The Texas Legislature has the right and prerogative to require an offender to serve time under supervision after getting released from prison, but the purpose served by this supervision should be to facilitate their return to society, not to place them on a shuttle making round trips back to prison.

87. If a supervision term has been violated, the releasee should be returned to prison for a remedial term commensurate with the supervisory violation. Such remedial terms should be measured in months, not years, and

should never exceed 12 months. Beyond one year, the time ceases to be remedial and begins to become punitive.

88. Administrators functioning with hardened correctional staff lack the structural insulation from prosecutorial influence to insure the indispensable elements of neutrality *coupled with* detached objectivity, which must necessarily accompany unbridled and unchecked discretion.

89. The above described administrative process violates basic the Due Process Clause of the 5th and 14th Amendments for the following reasons; (1) administrators are granted authority to impose punitive penal repercussions relating back to a crime when the custody portion of this offense has been fully served; (2) by administrative fiat (i.e. issuing parole guidelines) which provide no process for dealing with a parole violator, even though a high percentage of Texas inmates are serving time for parole violations; and (3) arbitrarily imposing severe penal punishments which bear no relationship whatsoever to the infraction bring them back to prison.

90. Plaintiffs demand a jury trial.

## Prayer for Relief

### § 1983 Remedies - Declaratory and Injunctive Relief

WHEREFORE, Plaintiffs request the following relief.

1. Issue a permanent injunction perpetually enjoining and restraining Defendants and all those in active concert or participation with Defendants from using the existing parole guidelines.

2. Issue an order adjudging and declaring that the Parole Board is to formulate new guidelines which embody these changes: (1) the creation of a determinative system of constrained discretion where the exercise of discretion is defined and limited to the placement of an offender near the beginning, the middle or end of a guideline range; (2) the severity of the crime will be based solely upon the trial court judgment; (3) probabilities will be purged from this instrument and in its place, guideline ranges will be created; (4) incorporate a presumption in favor of parole if a parole candidate has entered their guideline; (5) before this presumption of parole can be overruled, good cause for a deviation must be demonstrated, taking the form of a written report, setting forth details and fully complying Gov. Code. 508.144 (b) as amended.

3. Issue an order adjudging and declaring that the Parole Board is to apply these revised guidelines to every parole candidate and, further, make these parole guidelines the basic criteria upon which a parole decision is made.

4. Issue an order adjudging and declaring that the Parole Board is to formulate new hearing procedures for mandatory supervision candidates, which are predicated upon the premise that the inmate enjoys a presumption

favoring release and this presumption must be overcome by the Parole Board. Because mandatory supervision candidates have a liberty interest, hearing procedures are to conform to Morrissey v. Brewer, 408 U.S. 471, 488-89 (1972).

5. Issue a Declaratory Judgment and order Injunctive Relief requiring new guidelines tailored to technical parole violators and limiting incarceration to only remedial sentences, defined as one year or less.

6. Issue a Declaratory Judgment and order Injunctive Relief requiring the Parole Board to cease and desist from draconian practices which cause parolees to serve sentences in increments and declare as unconstitutional, the practice of making offenders serve sentences in excess of the calendar time ordered by the trial court.

7. Certify this as a class action.

8. Appoint a Master to supervise Parole Board activities, to assist in fashioning remedies and to monitor the implementation of these remedies.

9. Counsel for Plaintiffs seeks reimbursement of full attorney fees pursuant to federal law for all claims cognizable under 42 U.S.C. §1983.

10. Plaintiffs seek any other relief, developed by the evidence and consistent with the allegations pled herein, which is necessary or expedient for implementing any corrective action that has been specifically requested.

Respectfully submitted

Norman L. Sirak
Ohio Reg. # 0038058
D.C. # 162669
4974 Higbee Ave. – Suite 203
Canton, Ohio 44718
Phone (330) 493 – 7462
Fax (330) 493 – 7851
Email nsirak@parolereform.com